THE SEHAT LAW FIRM, PLC
Cameron Sehat, Esq. (SBN: 256535)
Monica Reyes-Santiago, Esq.
19800 MacArthur Avenue, Suite #1000
Irvine, CA 92612
T  (949) 825-5200
F  (949) 313-5001
Email: *Cameron@sehatlaw.com*

Attorneys for Plaintiff, Vincent Valdez
individually and as Personal Representative of the Estate
Vincent Nelson

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT VALDEZ, individually and as Personal Representative of the Estate, VINCENT NELSON;<br><br>　　　　　　　Plaintiffs,<br><br>　vs.<br><br>COUNTY OF LOS ANGELES, a Governmental Entity; DR. MELANY KIM, individually; Dr. JONATHAN SHERIN, individually; ALEXIS RAY, individually; and DOES 1 through 10, inclusive,<br><br>　　　　　　　Defendants. | Case No.:　**2:22-cv-00240**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Deliberate Indifference to a Substantial Risk of Harm to Health & Safety - 42 U.S.C.§1983 - 14th Amendment**<br>2. **14th Amendment - State Created Danger**<br>3. **Violation of Title II of The Americans with Disabilities Act and The Rehabilitation Act**<br>4. ***Monell* Violation for Failure to Train - 42 U.S.C. §1983**<br>5. ***Monell* Violation for Unconstitutional Custom, Policy and Practice - 42 U.S.C.§1983**<br>6. **14th Amendment - Interference With Familial Relations - 42 U.S.C. §1983**<br>7. **Negligence - Wrongful Death (State)**<br>8. **Failure to Summon Medical Care G.C. 845.6 & 844.6 (state)**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## **INTRODUCTION**

1.        This case involves the in custody  suicide of Vincent Nelson ("Mr. Nelson "), and Los Angeles County's and individual Defendant's deliberate indifference to Mr. Nelson's  health and safety.

2.    Mr. Nelson had previously been arrest and incarcerated Twin Towers Correctional Facility ("TTCF") where he was diagnosed with Schizophrenia, depression and anxiety on April 5, 2017.

3.   Mr. Nelson also had a known history of mental illness, was on psychiatric medication, had exhibited unpredictable and manic behavior, had previously been assigned to the High Observation Housing (HOH) at TTCF and had a prior suicide attempt when he attempted to take his life at TTCF in June 12, 2017. At that time, he was assessed as a suicide risk and placed in the High Observation Housing unit, a unit where deputies conduct welfare checks every fifteen minutes.

4.   While languishing in general population, Mr. Nelson who had previously been deemed incompetent to stand trial by a court psychiatrist and ordered to be committed at a state mental hospital, had severely decompensated to the point of taking his own life, despite the presence of a cellmate.  Mr. Nelson's death was preventable. If not for Defendants' failure to train, their maintenance of unconstitutional policies, practices, and customs, their knowing failure to abide with a 2015 U.S. Department of Justice settlement agreement which caused significant delays in transferring mentally ill pretrial detainees committed to state hospital, and their deliberate indifference to Mr. Nelson 's health and safety, Mr. Nelson  would be alive today.

5.   A pretrial detainee is allowed brief time outside of his cell, only during infrequent trips the dayroom, the brief and occasional shower periods, a visit from a family member or an attorney, response to sick call or receipt of medical attention, or an appearance in court. The remainder of the time is spent either in the cell, in the adjoining walkway, or in the cell of another prisoner in the same

cell block. There is no television, no radio, no entertainment other than what they and those who share their cell block can create, such as playing cards or dominoes on the concrete floor. Unless they have a penchant for writing, and except to the extent that their inclination and the strength of their eyes will permit them to read, most of the time there is little for them to do but sit or lie on their bed. Mr. Nelson, who suffered from severe mental illness and suicidal ideation, was left in these isolated conditions by Defendants in a small cell with a detainee who was also mentally ill, and upon information and belief, suicidal--resulting in Mr. Nelson's suicide. Defendants' failure to provide Mr. Nelson with basic level medical and mental health care, and a deliberate indifference to his health and safety caused his premature death.

## JURISDICTION AND VENUE

6.      The federal court of the Central District also has original jurisdiction over the federal civil rights claim pursuant to 28 U.S.C. §§ 1331 and 1343.  The federal court also has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367(a).

7.      This action is filed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983, to redress injuries and the death suffered by the plaintiffs' decedent at the hands of defendants.

8.    Jurisdiction and venue are proper in the Central District of California in that the acts of misconduct occurred within the Central District of California with such acts causing the death of Mr. Nelson .

9.      On or about June 14, 2021, Plaintiff submitted a California Tort Claim against the municipality, Defendant COUNTY OF LOS ANGELES ("COUNTY"). Plaintiff's claim was rejected on July 14, 2021, therefore Plaintiff has exhausted all administrative responsibilities.

10.    At all relevant times, Mr. nelson was a pre-trial detainee at the TTCF operated by the COUNTY.

11.    Venue is proper in the federal court of the Central District pursuant to Title 28 U.S.C. § 1391(b) and (c).

## PARTIES

12.      At all relevant times, Vincent Nelson was an individual residing in the County of Los Angeles, California. It must be remembered that the detainees concerned in this action are held prior to trial and thus have not been convicted of any crime. They are still entitled to the presumption of innocence, and their detention cannot be for purposes of punishment, deterrence or retribution. Furthermore, as a pretrial detainee, Mr. Nelson was deemed incompetent to stand trial, and thus as incompetent detainee is entitled a higher level of presumption due to his vulnerable status.

13.     Plaintiff, Vincent Valdez, is the biological father and sole surviving parent of Mr. Nelson. He is acting in his own capacity and as a successor-in-interest to Mr. Nelson's estate.

14.     Defendant COUNTY, at all relevant times herein mentioned were and is a business entity, of form unknown, having its principal place of business in the County of Los Angeles, State of California. The COUNTY purposely conducts substantial business activities in the State of California. COUNTY is a governmental entity that acts through individuals to establish its policies and that is capable of being sued under federal law. COUNTY, through the Los Angeles Sheriff's Department operates the TTCF, a County jail located in Los Angeles, California.

15.   Defendant Dr. JONATHAN SHERIN,  ("Dr. SHERIN") was at all times mentioned herein the Director of Los Angeles County Department of Mental Health and in charge of Men's Central Jail Mental Health Operations in Los Angeles County, the facility where Mr. Nelson resided at the time of his death. Dr. SHERIN is responsible for the management and administration of mental health services of the MCJ; for the selection, promotion, supervision, training, discipline, including retention of mental health worked working within the Men's Central Jail, including counselors, nurses, doctors, physician assistance, mental health staff and supervisors; and for the implementation of mental health policies and procedures at Men's Central Jail. Dr. SHERIN is regularly provided with reports concerning the treatment of mentally ill inmates, jail suicides, and other violations involving the mental health care and treatment of inmates at the jail. Dr. SHERIN is sued in his individual capacity, a supervisor for his own culpable action or inaction in the training , supervision or control of his subordinates, or his acquiescence in the constitutional deprivation which this Complaint alleges, or for conduct that showed reckless or callous indifference for others. Dr. SHERIN's

affirmative conduct involves his knowing failure to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which he knew or reasonably should have known would cause others to inflict a constitutional injury on Vincent Nelson.

16.     Defendant Dr. Melany Kim ("Dr. KIM") is a medical doctor specializing in psychiatry, and was responsible for providing competent mental health and medical care, treatment, medication recommendation, and follow-up care to Vincent Nelson. She was a duly authorized employee and agent of the COUNTY, acting under color of law within the course and scope of her perspective duties as a psychiatrist and with the complete authority and ratification of their principal, COUNTY. Defendant KIM is sued in her individual capacity.

17.     Defendant Alexis Ray ("RAY") is a psychiatric social worker, and was responsible for providing competent mental health and medical care, treatment and intervention to prevent attempts at suicide by inmates, housing recommendation, and follow-up care to Vincent Nelson. She was a duly authorized employee and agent of the COUNTY, acting under color of law within the course and scope of her perspective duties as a psychiatrist and with the complete authority and ratification of their principal, COUNTY. Defendant RAY is sued in her individual capacity.

18.     Plaintiff is unaware of the true identities and capacities of defendants DOES 1 through 10  but upon information and belief, said DOES are employees of the County, inclusive. Each of the fictitiously named defendants is in some manner and to some extent liable for the injuries alleged in this Complaint. Plaintiff will seek leave to amend this Complaint to allege the true identities and capacities of those fictitiously named defendants when they are determined.

19.     At all times mentioned herein, each Defendant was responsible in some manner or capacity for the occurrences herein alleged. Plaintiffs' damages,

as herein alleged, were proximately caused by all the acts and omissions of said Defendants. Defendants, COUNTY, and DOES 1-10 are sometimes collectively referred to herein as "Defendants" and/or as "All Defendants" and such collective reference refers to all specifically named Defendants.

20.     At all relevant times herein, Defendants were the agents, representatives and employees of each other and every other Defendant. In doing the things herein alleged, Defendants were acting under the color of law and within the course and scope of their duties of said alternative personality, capacity, identity, agency, representation and/or employment and were within the scope of their authority, whether actual or apparent.

21.     DOES 7-10 failed to train Sheriff Deputies and jail staff to identify indicators and behavior of persons in need of immediate medical care and/or persons with mental health issues; and failed to train Los Angeles County Sheriffs' Deputies and other jail staff to properly identify and communicate to superiors the need for immediate medical attention of persons in the jail.

22.     In committing the acts alleged in this complaint defendants acted knowingly, maliciously and with reckless or callous disregard for the constitutional rights of Plaintiffs justifying an award of punitive damages under federal law against each individual defendant.

## GENERAL ALLEGATIONS

23.     The TTCF located at 450 Bauchet St, Los Angeles, CA 90012, is the nation's largest mental health ward but has neither the expertise nor medical staff to house such an inmate population. Any deprivation of Mr. Nelson's liberty is very substantial punishment. But the punishment imposed upon a man deemed incompetent to stand trial by depriving him of in-patient treatment and confining him in the TTCF jail in order to insure his presence at trial is far more onerous than the legitimate purpose of such confinement can justify. The Constitution does not tolerate the "warehousing" of the mentally ill in jail settings.

24.      Defendant COUNTY is and was operating under a federal consent decree, United States District Court. Central District of California, Western Division, case# 15- 5903, because of the County's negligent management of its jails.

25.      Defendant COUNTY, Dr. SHERIN and DOES 7-10 are together responsible for the conditions of confinement and health and safety of persons incarcerated at the Jails. COUNTY, through its Department of Mental Health, provides mental health services to prisoners in the Jails.

26.      Defendant is legally responsible, in whole or in part, for the operation and conditions of the Jails, and for the health and safety of persons incarcerated there. Defendant COUNTY owns and operates the Jails; Defendant DOES 7-10 are responsible for the security and custody operations of the Jails; Defendant COUNTY, through its Department of Mental Health, is responsible for providing mental health care services to prisoners in the Jails; and Defendant COUNTY is responsible for funding the operations and maintenance of the Jails. This action concerns the administration of persons confined at the Jails, which houses adult male and female prisoners who are felons, gross misdemeanants, misdemeanants, pre-trial detainees, witnesses, or others being detained in protective custody.

27.      At all relevant times, Defendant or their predecessors in office have acted or failed to act, as alleged herein, under color of state law.

28.      The Jails are an institution within the meaning of 42 U.S.C. § 1997(1).

29.      Persons confined to the Jails include both pre-trial detainees and sentenced prisoners.

30.      Defendant has repeatedly and consistently disregarded known or serious risks of harm to prisoners at the Jails. At all relevant times, Mr. Nelson was a pre-trial detainee. As a pre-trial detainee, defendants owed a constitutional duty of care to Mr. Nelson's  medical needs and safekeeping under the recent

9th Circuit Appellate decision in *Gordon v. County of Orange et al, 888 F.3rd 1118 (April 2018).*

31.     However, in light of such constitutional standard of care, Defendants have repeatedly failed to take reasonable available measures to protect Mr. Nelson against the serious harm from suicide and self-harm due to, but not limited to: (1) inadequate suicide prevention measures; (2) lack of appropriate screening by custody and mental health staff to assess suicide risk; (3) lack of appropriate supervision, observation, and monitoring of prisoners, including those identified as at risk of suicide; (4) inadequate communication between mental health care and custody staff; (5) lack of appropriate multi-disciplinary treatment plans; (6) an inadequate suicide or critical incident review process; (7) placing two mentally unstable detainees in the same cell; (8) failure to conduct proper Title 15 welfare checks; (9) failure to house highly vulnerable mentally ill detainees in forensic in-patient program; (10) failure to hospitalize victim in psychiatric hospital that could perform an in-patient evaluation; (11) failure to monitor psychiatric medication intake; and (12) failure to follow up on multiple suicidal ideations.

32.     Defendants have maintained a physical environment at the Jails, including TTCF, that causes harm and poses an unreasonable, and known, risk of serious harm to prisoners' health and safety by failing to correct facility housing and maintenance problems in addition to inadequate housekeeping and sanitation that causes harm or poses a risk of harm to the prisoners and Staff within the facility.

33.     Through the acts and omissions alleged in this Complaint, Defendants have violated the rights, privileges, and immunities of persons, including Mr. Nelson , confined in the jails secured or protected by the Fourteenth Amendment to the Constitution of the United States. Defendants acted deliberately indifferent to Mr. Nelson's health and safety as a pre-trial detainee under the Fourteenth Amendment.

34.     Plaintiffs' Decedent was deprived of his interests protected by the Constitution or laws of the United States, and defendants caused all such deprivations while acting under color of state law.

35.     All acts or omissions alleged to have been engaged in by any individual defendants were committed with evil motive and intent, and in callous, reckless, and wanton disregard to the individual rights of Plaintiff.

## FACTUAL ALLEGATIONS

36.     Plaintiff incorporates all prior paragraphs and page allegations as the though fully set forth herein, including all exhibits.

37.     Due to his mental illness, Mr. Nelson was arrested and charged with making terroristic threats (P.C. §422) and a violation of parole on August 4, 2020. Upon information and belief, he was placed on a "*no-bail*" status and booked at twin towers correctional facility.

38.  While he was initially processed at the Intake Release Center, he was medically screen. However, the deputy reviewing the medical screening form noted "no history of suicidal attempt", "no history of mental illness", "no medication" and "no history of mental health treatment", all of which was false as a simple review of Mr. Nelson's prior 2017 incarceration medical records would have revealed his diagnosis of schizophrenia, substance use, depression and anxiety.  Most important, the medical records also noted an alert for a prior June 2017 suicide attempt and housing in the HOH unit. The past medical records also noted that Mr. Nelson, due to his mental illness, suffered from delusions, was hearing voices, had little to no insight into his psychiatric condition, at times denying his need for any treatment.

39.     On September 10, 2020, while attending his criminal court hearings, it soon became evident that Mr. Nelson's mental illness was severe enough to warrant a diversionary program, and in light of his past psychiatric history including a suicide attempt. The court, after a court referred psychiatric

evaluation, found Mr. Nelson incompetent to stand trial under the "FIST" program. Mr. Nelson's mental illness was severe enough to warrant inpatient psychiatric treatment. He was committed to the Patton State Hospital on October 1, 2020. Despite a positive finding from a court ordered psychiatric evaluation that Mr. Nelson suffered from a serious mental illness, and was deemed incompetent, department of mental health staff at the jail, (DMH), did not request a bed in the Forensic Inpatient Program ("FIP"). Per DMG policies, FIP is indicated for mentally ill inmates who either present an acute danger to self or others, or are "gravely disabled", due to a mental illness requiring in-patient care.

40. On October 5, 2020, Mr. Nelson, who has been nursing a nerve injury affecting his arm, informs the medical staff, through a medical slip, that his "*extreme nerve damage in my arm, **causing so much pain I am finding it difficult to live my life…**"*. This information along with the medical slip is placed in Mr. Nelson's digital medical file, searchable and accessible to other medical and custody staff of the LASD, the Department of Mental Health and Medical Service Bureau.

41. Just a few days later, on October 11, 2020, right around the time Mr. Nelson was committed by the court to be hospitalized at Patton state, Mr. Nelson's mental state is deteriorating, and while he is languishing in general population, places another urgent mental health request stating *"I need help falling asleep, please…I am having **Major Anxiety Attack, cannot sleep at all. Almost want to go man down hard to calm myself down too much stress."*** The term "man-down" in jail parlance refers to an inmate suffering a serious medical distress or death and thus, Mr. Nelson was expressing suicidal ideation as a solution to his anxiety. This information along with all medical slips are placed in Mr. Nelson's digital medical file, searchable and accessible to other medical and custody staff of the LASD, the Department of Mental Health and Medical Service Bureau.

42.   On October 15, 2020, in response his desperate plea for help, Mr. Nelson, who had psychologically decompensated, is seen by defendant RAY, a psychiatric social worker, who reviews his chart and notes his prior suicide attempt and history of psychiatric illness. She also notes Mr. Nelson attempting to *minimize* the severity of his mental health illness, at times denying the need for any medication or treatment. Despite a clear history of prior psychiatric illness and medication intake, a recent indication of self-harm ideations due to his anxiety attacks, and past history of suicide attempt at TTCF, defendant RAY does not refer him nor recommend Mr. Nelson to be transferred to either an observation unit, such as the HOH or MOH, which is more frequently checked by guards and medical staff.

43.   On October 26, 2020, a psychiatrist by the name of John Jimenez attends to Mr. Nelson and notes that he "***is difficult to redirect, pt, complaining of "bouncing off the walls, "trouble sleeping***". Dr. Jimenez prescribes a low dose, 1mg of Risperidol to address his sleeplessness but never follows up with him to evaluate the effects of the drug upon Mr. Nelson.  Dr. Jimenez further purports to conduct a *W&I* 5150-Suicide/Danger-to-self evaluation but concludes "no acute intervention was indicated at that time, not at imminent risk of self-harm" in light of Mr. Nelson's decompensated state and suicidal threats made in his medical request note.

44.     While at TTCF, Mr. Nelson  was never placed in the High Observation Housing  for his suicidal ideation, which requires 15 minute checks, 24 hours a day, and refers to designated areas for prisoners with serious mental illness who require an intensive level of observation and care and/or safety precautions. TTCF also had a higher level of care for mentally ill patients beyond the HOH, which was the Forensic In-Patient (FIP) program. The FIP houses prisoners who present an acute danger to self or others or are gravely disabled due to a mental illness and require inpatient care. Tiered HOH housing, unlike FIP

housing, was not designed for inpatient psychiatric treatment or for housing inmates with profound psychiatric illness.

45.   On November 24, 2020, Mr. Nelson is seen by Dr. KIM, she notes that his is a FIST inmate, deemed incompetent to stand trial, also noted was committed to a state hospital on October 1s, 2020. She also increases his Risperidol dosage from 1 to 3 mg, and notes that he reported a history of auditory hallucinations. It is unclear whether she informs Mr. Nelson that he was previously committed to state hospital because Mr. Nelson, based on Dr. KIM's note, appears apprehensive that his criminal case is "on hold". Dr. KIM's note also appear to minimize Mr. NELSON's symptoms based on the fact that his three medical requests on 10/11/20, and two subsequent medical request made on 12/2/20 and 12/12/20 indicate worsening symptoms of anxiety and sleeplessness.

46.   In fact, within the month preceding his death, Mr. Nelson placed several collect calls to his aunt, Bridget August, during which calls he pleaded for desperate help that the mental health staff was not helping him, that his psychiatric state had worsened, and that he wanted to take his life as a result of suicidal thoughts and ideation making remarks such as *"if I don't' get the f*** out of here, I am going man down"*.    Upon information and belief, the custody staff monitor collect call from inmate and as such, would have been apprised of Mr. Nelson's threat of suicidal intent.

47.   On December 2, 2020, Mr. Nelson is further decompensating, suffers from an aggravated state of anxiety and depression, unable to sleep and places another medical request informing mental health staff *"the pills I am prescribed make my anxiety worse, need different medication".* Mr. Nelson was referring to his Risperidone which was just recently titrated from 1mg to 3 mg on November 24, 2020.

48.    Clinical studies indicate that sleep deprivation for inmates who are otherwise healthy causes psychiatric symptoms to emerge such as cognitive

deficits, confusion, anxiety and sluggishness. Now if sleep deprivation affects inmates with a preexisting psychiatric conditions such as depression and bipolar disorder, including pretrial detainees deemed incompetent to stand trial, there is evidence of psychosis, mania and a high risk factor for suicide, especially after these inmates have previously suffered from a psychotic breakdown.

49.   According to Dr. KIM's charting notes, she was supposed to visit Mr. Nelson on December 8th but never did claiming there was a "custody related issue in unit 2000" .

50.   Again, on December 12, 2020, Mr. Nelson is continuing to suffer from sleepless nights which became a vicious cycle aggravating his anxiety and depression, and his suicidal thoughts. He puts another written medical request slip indicating: *"The medication I'm prescribed does not help me get to sleep at all. Can I please get medication switched to something that will help me get some sleep?"*  As of this day, Mr. Nelson's psychiatric medication, Risperidone had previously been increased from 1mg to 3 mg on November 24h despite contrary indication of its utility and noted "limited benefits" by Dr. KIM.

51.   On December 15, 2022, Dr. KIM admittedly notes that Risperidone had "limited benefits", even though Mr. Nelson indicated that it made *his anxiety worse* and including his inability to sleep. However, despite the drug's contraindication, Dr. KIM increased his Risperidone dosage from 3 to 5 mg, and in light of Mr. Nelson previously imploring to change his medication because it making his symptoms worse including his self-harming behavior. Dr. KIM also added Remeron and Benadryl but never followed up with Mr. Nelson past this date to see what effects the increased dose and the two new drugs had on him. Despite his prior suicidal ideations, the medical slips, and past psychiatric condition and history of suicide attempt, Dr. KIM does not recommend Mr. Nelson to the FIP or the HOH, rather she sends him back to the general population when she knows there is minimal supervision and psychiatric intervention.

52. When individuals with serious mental illness who are deemed incompetent wait in jail for competency restoration treatment, they become more difficult to restore competency because of the lack of treatment. Conditions of confinement are extremely harsh and punitive, and thus serves the opposite effect of a therapeutic milieu required to restore pretrial detainee' mental health. Specifically, once an incompetent pretrial detainee such as Mr. Nelson suffers from an acute exacerbation of psychiatric symptoms while in jail, it is vital they receive mental health treatment right away; otherwise their prognosis become worsens by the day. Specifically, clinical research has shown that once a person experiences an acute psychotic episode such as mania, depressive or a suicidal crisis, the longer the individual goes without treatment, the worse his psychiatric prognosis.

53. On December 18, 2020, at approximately 7:00 p.m., upon conducting a pill call, Nurse Amaya and an escorting deputy called "Man down" when they came upon Mr. Nelson's cell, he is standing by the cell bars facing towards the wall with a blanket wrapped around this neck, and not moving.

54. Upon information and belief, Mr. Nelson's cellmate, who was classified as actively suicidal, had allegedly slept through Mr. Nelson's act of hanging himself, and was then alerted by the nurse to raise Mr. Nelson in order to relieve pressure on his neck. The cellmate was also ordered to initiate rescue breathing even though he was likely not trained on administering CPR. Once the paramedics arrived and attended to Mr. Nelson, a week pulse was regained and breathing resumed. Mr. Nelson was transported to LAC-USC. However, although he regained a pulse, he had been deprived of oxygen for an irreparable amount of time, causing him to suffer from anoxic encephalopathy, or brain death. He was taken off life support and expired at 5:20 a.m. on December 22, 2020.

55. Defendants had implemented a "buddy system" for suicidal inmates as a deterrent for suicidal acts. However, the obvious flaw in this system is if both

inmates are suicidal, then the presence of another suicidal inmate may encourage the fist inmate to commit his final act knowing that the person who is supposed to watch for him, could careless since he too is suicidal.

56.  In light of  Mr. Nelson's fragile psychiatric condition, it was apparent and foreseeable that incarceration of a committed incompetent detainee, in a custodial environment such as TTCF--an even more extreme restriction of liberty--could result in rapid deterioration of his psychiatric condition. Despite this information, Defendants did not request placement in the FIP to ensure that Mr. Nelson 's condition could be appropriately monitored and treated, nor did Defendants assess whether Mr. Nelson  could be safely housed outside the FIP.

57.      The TTCF has been and is currently working under federal supervision since September 3, 2015 pursuant to Defendant's Order Approving And Entering Joint Settlement Agreement As An Order, Stipulation and Order Approving And Entering Joint Settlement Agreement As An Order in case #15-5903, United State District Court For The Central District of California, Western Division. (***See Exhibit #1***). This order resulted in bi-annual reporting requirements concerning the conditions for detainees with mental health issues at TTCF, and whether the agreement imposed by the court has been adhered to. The latest report, which concerned the period of July 1, 2020 - December 31, 2020, indicated that "*the pace of compliance has slowed and a number of the most challenging mental health provisions remain Non-Compliant now more than five years after the Agreement was executed*." (***See Exhibit #2***). Some of the issues indicated in the report are staffing deficits, *a failure to provide mental health assessments after an adverse triggering event such as suicide attempts or self-injurious behavior*, a *failure to provide clinically appropriate mental health crisis intervention services*, and an analysis indicating that only 2% of the records reviewed in the second quarter and 4% in the third quarter reflected that HOH inmates were offered clinically appropriate treatment at least weekly and were seen by a Qualified

Mental Health Professional at least once a month.

58.      Mr. Nelson was 28 years old when he passed away.

## FIRST CLAIM FOR RELIEF

**DELIBERATE INDIFFERENCE TO A SUBSTANTIAL RISK OF HARM TO HEALTH & SAFETY-42 U.S.C. § 1983, 14th Amendment of the U.S. Constitution**

**(Against All Individual Defendants and DOES 10)**

59.      Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

60.      Plaintiffs bring their deliberate indifference claim under the standards articulated in *Gordon v. Cty. of Orange*, 888 F.3d 1118 (*9th Cir. 2018)*.

61.      From the time decedent was booked at the TTCF until the time of death, the Defendants repeatedly denied Mr. Nelson safe psychiatric housing and treatment in repeated violation of his 14th Amendment constitutional rights.

62.      All Defendants, including Dr. KIM, Dr. SHERIN, and DOES 1-10 and RAY were informed that Mr. Nelson suffered from a serious mental illness, had been committed to a state hospital, was court ordered to received in-patient psychiatric treatment, was psychiatrically unstable, had previously attempted suicide, had psychologically decompensated, and had alerted the mental health staff of suicidal ideations.

63.      All Defendants were informed that Mr. Nelson's prescribed psychiatric mediation was specifically making his condition *worse*, and aggravated his depression, anxiety and suicidal ideation.

64.      All of the Defendants knew there was a substantial risk to Mr. Nelson's safety if he remained in general population, but repeatedly denied him safe placement, monitoring and treatment while in the jail.

65.      Defendants made an intentional decision with respect to the

conditions under which Mr. Nelson was confined. To wit, defendants deliberately ignored his cries for his anxiety attacks, and threats to cause self-inflicted harm, and failed to transfer him to a higher level of psychiatric care. The numerous medical slips alerting the medical staff of suicidal ideations, coupled with his incompetent status requiring him to be promptly committed to a psychiatric hospital, necessitates a higher level of psychiatric care and observation in either the HOH or FIP. Mr. Nelson qualified for this higher level of care because he presented an acute danger to himself and was gravely disabled due to his mental illness. Defendants including KIM, RAY and DOES 1-10 were also callous and deliberately indifferent to Mr. Nelson when it was obvious he needed urgent medical care as  he continues to languish in general population, with another suicidal inmate, untreated.

66.     Those decisions placed Mr. Nelson at a substantial risk of danger, and risk of suffering severe harm and suicide because every Defendant was unequivocally informed of Mr. Nelson's incompetent status due to a serious mental illness, suicidal ideations, and a deliberate increase in dosage of contraindicated psychiatric medication, expectedly exacerbated his condition. Those decisions also placed Mr. Nelson at a substantial risk of danger to his health, because every Defendant knew that the longer Mr. Nelson went untreated, the greater the risk of a worse psychiatric prognosis.

67.     Defendants did not take *reasonable available measures* to abate those risks, even though reasonable officials in the circumstances would have appreciated the high degree of risk involved-making the consequences of the defendants' conduct obvious. Those reasonable available measures included: (1) adequate suicide prevention measures; (2) appropriate screening by custody and mental health staff to assess suicide; (3) appropriate supervision, observation, and monitoring of prisoners, including those identified as at risk of suicide; (4) adequate communication between mental health care and custody staff;

(5) appropriate multi-disciplinary treatment plans; (6) adequate suicide or critical incident review process; (7) ensuring two mentally suicidal detainees were not housed in the same cell; (8) conducting proper Title 15 welfare checks; (9) housing highly vulnerable mentally ill detainees in forensic in-patient program; (10) hospitalization of victim in a psychiatric hospital that could perform an in-patient evaluation; (11) promptly replacing as opposed to increasing dosage of psychiatric medication which actually enhanced Mr. Nelson's suicide risk and was known to be a side effect of the same; (12) monitor psychiatric medication intake; (13) housing Mr. Nelson in the FIP unit pending his transfer to state hospital.

68.     By not taking such measures, the defendants caused Mr. Nelson 's injuries and ensuing death.

69.     It was objectively unreasonable for the Defendants to ignore the numerous objective signs and symptoms of a serious health, safety and mental health crisis. The denial of placing Mr. Nelson in the forensic in-patient unit for psychiatric treatment and monitory, and failing to take other reasonable measures placed Mr. Nelson 's life in jeopardy and acted with deliberate indifference to a substantial risk of harm to Mr. Nelson 's safety.

70.     Accordingly, Defendants each are liable to Plaintiffs for compensatory, including *Chaudry v. County San Diego*-loss of life and loss of opportunity of life damages, pre-death pain and suffering damages, punitive damages under 42 U.S.C. § 1983 and the 14th Amendment, as well as for wrongful death damages.

## SECOND CLAIM FOR RELIEF
### 14th AMENDMENT-STATE CREATED DANGER
### (Against All Individual Defendants and DOES 1-10)

71.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

72.     Under the Fourteenth Amendment, Mr. Nelson had the constitutional right to be free from defendants' affirmative action of placing him in a position of actual, particularized danger. In this case, defendants knew that Mr. Nelson was evaluated and deemed incompetent to stand trial as a result of his mental illness, knew that he had decompensated while in jail, knew that his anxiety and psychosis aggravated while in jail, knew that he required psychiatric in-patient treatement, knew that he was making suicidal ideations, knew that he had history of suicide attempt at the TTCF and suffered from schizophrenia and bi-polar disorder, and that he was in danger of being to himself.

73.     While in the general population, Mr. Nelson was in Defendants' care and custody, and as such, defendants had an affirmative duty not to expose Mr. Nelson to more danger than he would have been prior to his incarceration.

74.     By blatantly ignoring Mr. Nelson's complaints due to his decompensated state, complaints that his prescribed psychiatric medication was worsening his mental state, threats to kill himself, and failing to place Mr. Nelson in close observation in the forensic in-patient unit, and by allowing an incompetent inmate to remain in general population knowing very well there was a court ordered state hospital commitment which necessitated prompt inpatient psychiatric treatment, Defendants made an affirmative decision which consequently placed a known mentally ill detainee in grave danger and created a risk of suicide. Mr. Nelson was not actively suicidal upon being admitted to the jail, but his condition deteriorated specifically because of the conditions of confinement causing decompensation to the point of self-harm.

75.     By failing to treat Mr. Nelson in the forensic in-patient unit and allowing Mr. Nelson in the general population, in his decompensated state, defendants also acted with deliberate indifference to a known or obvious danger.

76.     Defendants' affirmative acts created a foreseeable risk that Mr. Nelson would be in grave danger if he remained in general population with no access to

in-patient psychiatric treatment.

77.     Accordingly, Defendants each are liable to Plaintiffs for compensatory and punitive damages under 42 U.S.C. § 1983 and the 14th Amendment, as well as for wrongful death damages.

### THIRD CLAIM FOR RELIEF

### VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT

### (42 U.S.C. § 1983) (Against Defendants COUNTY and DOES 7-10)

78.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

79.     Claim Three is a claim for disability discrimination against Defendants and, pursuant to 42 U.S.C. § 1983, for violating Title II of the Americans with Disabilities Act (ADA) (public entities). Title II of the ADA prohibits disability-based discrimination by any public entity. *See* 42 U.S.C. §§ 12131-12132; 28 C.F.R. § 39.130; and 28 C.F.R. §35.130.

80.     Section 504 of the Rehabilitation Act prohibits discrimination against an individual based on disability by any program or entity receiving federal funds. *See* 29 U.S.C. §§ 794(a), (b)(1)(A), (b)(1)(B), and (b)(2)(B).

81.     These disability anti-discrimination laws impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.

82.     Mr. Nelson was disabled as defined in 42 U.S.C. § 12102 and 42 U.S.C. §§ 12131, 28 C.F.R. §§ 35.108, as he suffered a serious mental illness impairment that substantially limited one or more of his major life activities.

83.     Defendant COUNTY is a program or entity that receives federal financial assistance.

84.     Defendant COUNTY is a public entity as defined by Title II of the ADA.

85. Defendant COUNTY's jail, the TTCF Jail, is a facility and its operation comprises a program of service for purposes of Title II of the ADA.

86. Mr. Nelson  was an individual qualified to participate in or receive the benefit of  COUNTY's services, programs, or activities

87. Mr. Nelson  was abused because of his disabilities by COUNTY's agents and employees at the County jail.

88. Mr. Nelson  was abused when he was denied safe and appropriate psychiatric treatment for known mental health condition he suffered due to his disability, which was known to Defendant COUNTY and its agents and employees, and the abuse of Defendant COUNTY and its agents and employees. Such abuse and denial of appropriate psychiatric placement by Defendant CITY and its agents and employees was in spite of NELSON 's disability. Such abuse constitutes discrimination against individuals based on their disability in violation of the Rehabilitation Act and Title II of the ADA.

89. At the time of this incident, TTCF had a fully operational in-patient psychiatric unit inside the facility providing psychiatric treatment to other inmates situated similarly to Mr. Nelson who were gravely disabled, and had decompensated as a result of a serious mental illness. Any claim that that the jail FIP was overwhelmed by other psychiatrically decompensated inmates is inexcusable since the COUNTY had known of such problem for many years and had ample time and opportunity to remedy such shortage of beds at the FIP, and most recently as of 2015 DOJ Settlement Decree, the latest 2020 monitor report (***See Exhibit #2),*** was put on notice that it was still non-compliant in providing adequate mental healthcare to its mentally ill population.

90. Defendant COUNTY failed to provide a safe place to house Mr. Nelson and failed to admit him to the appropriate level of psychiatric care that he needed--the forensic in-patient unit.

91. Defendant COUNTY showed a deliberate indifference towards Mr.

Nelson and his safety and psychiatric care when the COUNTY:

a.    Failed to provide safe housing placement at TTCF pending transfer to a state hospital;

b.    Failed to admit Mr. Nelson to the forensic in-patient unit, or at minimum in the HOH where he would be closely monitored and benefit from 15 minute safety checks.

c.    Failed to provide services or accommodate Mr. Nelson with access to the programs and services of COUNTY's designated mental health facilities within Los Angeles County Jails for person who qualify for access and services under California and federal law;

d.    Failed to provide services or accommodate Mr. Nelson as indicated and with appropriate classification, housing and monitoring for a person in their sole and exclusive custody who they knew was mentally disabled and deemed incompetent;

e.    Failing to provide reasonable accommodations to people in custody with mental disabilities pending transfer to a state hospital, and providing instead quality of care and service that is different, separate, and worse than the service provided to other individuals with the same disabilities;

f.    Failed to comply with the U.S. Department of Justice requirements regarding care, treatment and security to persons with mental disabilities, resulting in discrimination against Mr. Nelson, under the ADA and RA.

92.    Plaintiffs bring this claim as both successor-in-interest to Mr. Nelson and individually, seeking both survival and wrongful death damages for the violation of Ms. Tater's rights. Plaintiff also seeks attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF
### *MONELL*- FAILURE TO TRAIN (42 U.S.C. §1983)
### (Against Defendant COUNTY, Dr. SHERIN and DOES 7-10)

93.    Plaintiff repeats and re-alleges each and every allegation in paragraphs

1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

94.   Defendant COUNTY and Dr. SHERIN knew that Mr. Nelson was suffering from serious psychiatric conditions and that he was a threat to his own safety. Given the known limitations of the County jail, it was obvious that County jail detention staff, including the individual defendants would need special training in order to seriously address the obvious risk of decompensation by incompetent detainees suffering from a serious mental illness and waiting for their state hospital transfer.

95. Defendants and DOES 1-10 had not been trained in the proper assessment of reported threats to self harm, and the proper assessment to place detainees with severe mental illness in the appropriate housing placement and under close observation. This failure to train led to a complete failure of care to Mr. Nelson , ultimately resulting in his death.

96. Despite TTCF's general jail policies and procedures requiring that threats of suicide ideation be investigated and appropriately addressed, and the policy and procedure that severely mentally ill and suicidal individuals be housed in the forensic in-patient unit, COUNTY had failed to train the detention staff adequately as to recognize the urgency with which these threats and detainees must be assessed.

97. Defendant COUNTY further had a custom, practice and policy of ignoring threats of suicide ideations and minimizing symptomology of decompensated inmates.

98. Defendant COUNTY employees had a custom and practice of placing severely psychiatrically unstable inmates in a lower level of psychiatric care because of a lack of availability of space in the higher level care units.

99. Defendant COUNTY employees had a custom and practice of delaying the assessment of suicide ideation and delaying the review and effectiveness of

psychiatric medication, some of which have known side effects to increase the risk of suicide.

100.     As a result of the COUNTY's failure to adequately train and implement policies, Mr. Nelson was caused undeserved pain and agony all culminating to his suicide on December 18, 2020.

101.     As a direct and legal result of Defendants' acts, Plaintiff has suffered damages, including, without limitation, funeral expenses, and past and future pain and suffering, loss of life, loss of opportunity for life, and compensatory damages. Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiffs for compensatory and punitive damages under 42 U.S.C. § 1983.

### FIFTH CLAIM FOR RELIEF
### *MONELL*- UNCONSTITUTIONAL CUSTOM, POLICY OR PRACTICE (42 U.S.C. §1983)
### (Against Defendant COUNTY and DOES 5-10)

102.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

103.     On and for some time prior to December 18, 2020, (and continuing to the present date) Defendants COUNTY deprived Plaintiffs' decedent of the rights and liberties secured to them by the Fourteenth Amendment to the United States Constitution, in that said defendants and their supervising and managerial employees, agents, and representatives, acting with  reckless and deliberate indifference to the rights and liberties of  Plaintiffs' decedent and of persons in his class, situation and comparable position in particular, knowingly maintained, enforced and applied an official recognized county custom, policy, and practice of: Acting deliberately indifferent to the substantial risk of harm to the safety of detainees when defendants failed to take any meaningful corrective measures

regarding threats of suicide, and failing to safeguard and adequately treat pretrial detainee deemed incompetent and committed to state hospital, and failure to appropriately place severely mentally ill detainees in the FIP unit. The following is a list of *Monell* violations:

> (a) Failing to implement policies and procedures on assessment of threats of suicide and adequate assessments of detainees who are a danger to themselves;

> (b) Routinely failure by medical staff to assess the symptoms and assessment of inmates suffering from suicidal ideations requiring admittance to the FIP and minimizing of suicidal symptoms;

> (c) Inadequately supervising, training, controlling, assigning, and disciplining employees including TTCF Jail staff;

> (d) Routinely neglecting and ignoring threats of suicide and enabling the custom and practice of housing suicidal inmates in general population;

> (e) Engaging in the custom and practice of discriminating against mentally ill inmates and withholding urgent housing transfers;

> (f) Inadequately screening, by custody and mental health staff, to assess suicide risk;

> (g) Failing to appropriately supervise, observe, and monitor detainees, including those identified as a risk of suicide or homicide;

> (h) inadequately communicating between mental health care and custody staff;

> (i) Failing to implement appropriate multi-disciplinary treatment plans;

> (j) Failing to implement adequate suicidal or critical incident review processes;

> (k) Repeatedly placing two mentally unstable detainees in the same cell;

> (l) Inadequately conducting proper Title 15 welfare checks;

(m) Failing to house highly vulnerable mentally ill and detainees deemed incompetent to stand trial in FIP, despite clear indications that the detainees require more intensive treatment and supervision;

(n) Failing to hospitalize detainees in a psychiatric hospital that could perform an in-patient evaluation;

(o) Failing to provide adequate psychiatric assessment, treatment and intervention

104.     On December 19, 2002, the Los Angeles County and the United States entered into a Memorandum of Agreement Regarding Mental Health Services at the Los Angeles County Jail ("MOA"). The MOA was entered into to avoid potential litigation concerning the mental health services at the jail.  Among the provisions in the agreement is the acknowledgment that:

(a) the "Sheriff of Los Angeles County, and the Los Angeles County Sheriff's Department of Mental Health are responsible for overseeing and/or providing mental health services to the inmates at the Jail;"

(b) the "Mental health staff shall make weekly rounds in locked down non mental health housing modules (e.g. administrative segregation, disciplinary segregation) at the Jail to identify inmates who may have been missed during screening or who *have decompensated whi*le in the Jail;"

(c) "the County shall provide adequate mental health treatment to all inmates determined to be mentally ill;"

(d) "the County shall ensure adequate therapy and counseling for all mentally ill inmates who need such care.  This includes adequate space for treatment, adequate staff to provide treatment, and adequate therapeutic programming;"

(e) "the County shall ensure that inmates observed to be *potentially* suicidal receive appropriate crisis intervention, (including placement in a safe setting and evaluations in a timely manner), by qualified mental health professional to

determine whether and *what level of suicide observation is required*;"

(f) "the County shall provide sufficient mental health staffing to ensure timely access to adequate mental health treatment and meet the obligations and provide the services listed in this Agreement;"

(g) "the County shall implement mandatory orientation and continuing competency based in-service training for correctional staff in the identification and custodial care of mentally ill inmates, including, but not limited to: (b) recognizing and responding to indications of suicidal thoughts, (c) proper suicide observation, and (f) response to mental health crises, including suicide intervention . . . the County shall provide annual refresher training;"

105.     On June 4, 2014, the Department of Justice ("DOJ") sent to County Counsel a compliance letter on the 2002 MOA about treatment of the mentally ill. The DOJ found: "Based on our review, we ***conclude that the County violates the Eighth and Fourteenth Amendments of the United States Constitution by failing to provide adequate mental health services and protect prisoners from serious harm and risk of harm at the Jails due to inadequate suicide prevention practices***."

106.     The June 4, 2014 DOJ letter articulated numerous systemic failures of Defendant COUNTY to maintain constitutionally adequate mental health care which directly applied to the unconstitutional treatment of Mr. Nelson  and his untimely death. These conditions, include, but are not limited to:

(a) There was inadequate mental health care to prevent prisoners from becoming suicidal, to identify suicidal prisoners, or to prevent prisoners from going into crisis.

(b) The Los Angeles County Jails do not provide appropriate custodial supervision for prisoners, resulting in repeated lapses in the Jails' safety checks, creating a serious risk of harm to prisoners;

(c) The general lack of adequate supervision is especially troubling

given the hazardous conditions, including known suicide risks that exist in nearly every housing unit in the jails. Prisoners with mental illness are housed in conditions that present, rather than prevent, a risk of suicide. Deputies do not consistently perform timely, thorough safety checks.

(d) Custody staff of the LASD, the Medical Services Bureau, and the Department of Mental Health had inadequate intake screening and identification of individuals with mental illness and are at risk for suicide, ignoring significant mental health history;

(e) Incomplete information collection and communication in intake assessments and evaluations: Although LASD conducts screenings to identify prisoners who may be at risk for suicide or self-harm, screenings are often not filled out completely or adequately incorporated into the prisoner's electronic medical record. As a result, intake screening is insufficient to identify and protect individuals at risk for suicide;

(f) Custody staff of the LASD, the Medical Services Bureau, and the Department of Mental Health often operate in "silos" when addressing suicide incidents and risks, resulting in a lack of communication, or miscommunication between representatives of these entities, causing a critical breakdown in the custody and care of the prisoners in the Jails;

107.     The actions and inactions of the LASD, the Department of Mental Health and the Medical Services Bureau set forth in the preceding  paragraphs were known or should have been known to the policy makers responsible for the Defendant COUNTY and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train,

supervise or discipline in areas where the need for such training was obvious.

108.     The actions and omissions of Defendant COUNTY set forth in the preceding paragraphs were a motivating force behind the violations of Mr. Nelson's constitutional rights as set forth in this complaint.

109.     The TTCF has been and is currently working under federal supervision since September 3, 2015 pursuant to the Order of the Joint Settlement Agreement (***See Exhibit #1).*** Jail. The Settlement Agreement was specifically intended to ensure measures to protect prisoners from conditions that "place them at unreasonable risk of harm from suicide, self-injurious behavior, or unlawful injury by others, in accordance with their constitutional rights." The Settlement Agreement resulted in bi-annual reporting requirements concerning the conditions for detainees with mental health issues at TTCF, and whether the agreement imposed by the court has been adhered to**.** The latest report, the 11th, which concerned the period of July 1, 2020 - December 31, 2020 ***(See Exhibit #2),*** indicated that "*the pace of compliance has slowed and a number of the most challenging mental health provisions remain Non-Compliant now more than five years after the Agreement was executed*." Some of the issues indicated in the report regarding areas of non-compliance, are clear *Monell* violations, as these areas have been repeatedly non-compliant for years--thus establishing that defendant COUNTY has maintained unconstitutional customs, practices, and policies. COUNTY was on notice of its issues of non-compliance, as established by the decree and the monitoring reports. The following is a list of these *Monell* violations, which the report deemed "non-compliant"*:*

(a) Repeatedly suspending group mental health treatment;

(b) Failing to provide mental health assessments after an adverse triggering event;

(c) Failing to provide clinically appropriate mental health crisis intervention services;

(d) Failing to provide adequate staffing to meet the needs of the mental health detainees at FFTC;

(e) Failing to maintain sufficient HOH housing;

(f) Failing to offer HOH inmates clinically appropriate treatment, at least weekly;

(g) Failing to offer HOH inmates an appointment with a QMHP at least once a month;

(h) Failing to provide clinically appropriate structured mental health treatment;

(i) Failing to adequately manage the active number of mental health caseloads

(j) Failing to provided adequate therapeutic services in mental health housing

(k) Failing to provide adequate out-of-cell time in HOH

110.    The continued deficiency in complying with the 2015 decree enabled Mr. Nelson's as inadequate staffing, housing, treatment, and caseload management all resulted in Mr. Nelson's  mental health falling to the wayside, and causing to deteriorate into suicidal behavior. These deficiencies are even more egregious considering that Mr. Nelson who, upon information and belief, was a no-bail status, was compelled to go to jail, had no other option for mental healthcare, and most importantly, was not suicidal when initially booked.

111.    By reason of the aforementioned policies and practices of Defendants and COUNTY, Plaintiff has suffered the loss of his son.

112.    Defendant COUNTY, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said defendants also acted

with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Mr. Nelson and other individuals similarly situated.

113.　　By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendants COUNTY, acted with an intentional, reckless, and callous disregard for the well-being of decedent and his constitutional as well as human rights.

114.　　Furthermore, the policies, practices, and customs implemented and maintained and still tolerated by Defendants COUNTY were affirmatively linked to and were a significantly influential force behind the decedent's death.

115.　　As a direct and legal result of Defendants' acts, Plaintiffs have suffered damages, including, without limitation, funeral expenses, and past and future pain and suffering, pre-death pain and suffering, loss of life, loss of opportunity for life, and compensatory damages.   Such damages including attorneys' fees, costs of suit, and other pecuniary losses not yet ascertained. Additionally, Defendants are liable to Plaintiffs for compensatory and punitive damages under 42 U.S.C. § 1983.

## SIXTH CLAIM FOR RELIEF

## 14th AMENDMENT-INTERFERENCE WITH FAMILIAL RELATIONS (Against All Individual Defendants and DOES 1-10)

116.　　Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

117.　　Plaintiff Vincent Valdez had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with his son, Vincent Nelson.

118.     Plaintiff's decedent, Vincent Nelson, had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in his familial relationship with his father, Vincent Valdez.

119.     The aforementioned actions of Defendants and DOES 1-10, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Mr. Nelson  and Plaintiff, and with purpose to harm unrelated to any legitimate penological objective.

120.     As a direct and proximate result of these actions, Mr. Nelson experienced pain and suffering, including psychological decompensation, confusion, anxiety, mental distress, agony and despair, and eventually died. Defendants thus violated the substantive due process rights of Plaintiffs to be free from unwarranted interference with their familial relationship with Mr. Nelson .

121.     As a direct and proximate cause of the acts of Defendants, Plaintiff suffered emotional distress, mental anguish, and pain.  Plaintiff has also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Mr. Nelson , and will continue to be so deprived for the remainder of his natural live.

122.     As a result of their misconduct, Defendants and DOES 1-10, are liable for Mr. Nelson 's injuries, either because they were integral participants in the and failure to provide safe and appropriate housing, or because they failed to intervene to prevent these violations.

123.     Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Nelson 's and Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to the individual Defendants.

124.     Plaintiff Vincent Valdez brings this claim both individually and  as a successor-in-interest to the decedent, and seek survival and wrongful death damages under this claim.  Plaintiff also seeks punitive damages and attorneys' fees under this claim.

## SEVENTH CLAIM FOR RELIEF
### NEGLIGENCE-WRONGFUL DEATH
### (Against All Defendants and DOES 1-10)

125.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

126.     Plaintiff brings this action pursuant to the California Wrongful death statutes as codified in Code of Civil Procedure §377.60, §377.32 and §377.34.

127.     The decedent is survived by his father, Vincent Valdez, who is entitled to recover wrongful damages for his death.

128.     The decedent did not bring any action for personal injury in his lifetime, and no other action from the death of Decedent has been commenced against the defendants.

129.     On October 21, 2021, under the recently passed *Senate Bill 447*, Plaintiff, as a successor-in-interest to his son, will also recover for any pre-death pain, suffering and disfigurement that Mr. Nelson endured before taking his own life. Such survival damages are now recoverable under this newly enacted statute.

130.     Defendant COUNTY is vicariously liable for the negligent acts of its employees while performed in the scope of employment.

131.     Defendants and DOES 1-10 owed a duty of care to Mr. Nelson, while he was in their care and custody, to prevent endangering a known mentally ill pretrial detainee who was suffering from a mental health crisis. Defendant owed a duty to provide reasonable security and render access and delivery of mental and medical care, treatment and/or emergency services for his mental condition.

Defendants further owed a duty of care to Mr. Nelson to ensure he was receiving adequate psychiatric treatment while awaiting his transfer to state mental hospital and to ensure that he was placed in a safe housing location of the jail.  Defendants owed a duty of care to make sure he would not languish for unnecessarily in general population, and in the county jail generally, where the level of mental health care is notoriously lacking as evidenced by the 2015 Settlement decree with the U.S. Department of Justice.  Defendant owed a duty to ensure that Mr. Nelson was promptly transferred to a state hospital after his October 1, 2020 commitment date.  Defendants owed a duty of care to make sure Mr. Nelson would be placed in the FIP, as he was gravely disabled due to his mental illness, had a prior history of suicide attempt while at the TTCF, and presented an acute danger to himself-- requiring inpatient care. Defendants owed a duty of care not to ignore complaints of suicidal ideation and intent.

132.     It was foreseeable that Mr. Nelson, a suicidal detainee with severe bipolar and anxiety attacks, and who had evidently decompensated, would be in grave danger if allowed to remain in the jail, untreated and in a cell with another detainee, who upon information and beliefs was also suicidal, and whose presence was in theory, designed to act as a suicide deterrent. Upon information and belief, at the time of the incident, this other cellmate was heavily medicated to render moot his ability to deter Mr. Nelson from committing suicide.

133.     It was also foreseeable that allowing Mr. Nelson to remain in the county jail past his commitment date, that given his psychiatric condition would place  in grave danger of further injury or death. Additionally, it was foreseeable that allowing a pretrial inmate deemed incompetent to remain in a lower level of mental health care without adequate treatment would cause him decompensate until he became a danger to himself.

134.     Defendants breached their duty of care to ensure that their in-custody, the person who they were directly responsible for, was reasonably safe during the

time he was in their custody and care. Defendants, cumulatively further breached their duty of care to make sure Mr. Nelson was placed in a safe housing location under frequent observation.  Defendants breached their duty of care when they failed to transfer Mr. Nelson within a reasonable period of time past his mental state hospital commitment date.  At the least, defendant breached their duty of care by not ensuring that an adequate bridge order took place and that a competent level of mental healthcare was provided to Mr. Nelson within the Defendant's continuity of care responsibilities. Defendants also breached their duty by failing to place Mr. Nelson, either in the high observation unit or  in the FIP, where he would receive the higher level of care and observation that he needed.

135.   Defendants knew, or in the exercise of reasonable care should have known that by ignoring a mentally ill detainee, especially one who was experiencing suicidal tendencies and ideations, without increasing the level of mental health treatment and level of observation would place Mr. Nelson in immediate and grave danger. Defendants knew or in the exercise of reasonable care should have known that by failing to house Mr. Nelson, a known mentally incompetent and gravely disabled inmate, into FIP, they were providing insufficient mental health care, and endangered the life of Mr. Nelson .

136.    That as a direct and proximate result of the acts and omissions of the Defendants, and each of them, Decedent has suffered injuries to his body and his mind all of which survives his death and are represented by Plaintiff Vincent Valdez as successor-in-interest to Mr. Nelson's special and general damages. All to Plaintiffs' general damage in a sum according to proof at the time of trial.

137.    As a further direct and proximate result of defendants conduct, said conduct was so in fact done with recklessness, oppression and malice, defendants knew or should have known that to outright ignore the complaints of threats to go "man-down" , such an act was so despicable and done with willful and knowing disregard for the safety of Mr. Nelson , justifying the award of exemplary '

damages.

## EIGHTH CLAIM FOR RELIEF

### FAILURE TO SUMMON MEDICAL CARE G.C. § 845.6 & 844.6
### (Against All Defendants and DOES 1-10)

138.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1-5 and 12-58 of this Complaint with the same force and effect as if fully set forth herein.

139.     California Government Code §845.6 creates an affirmative duty for jail deputies to furnish or obtain medical care for a prisoner in his/her custody. In fact, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to known that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

140.     By virtue of the foregoing, Defendants, knew or had reason to know that Mr. Nelson needed in-patient psychiatric treatment and that he had serious and obvious mental illness that put the staff on notice that they should have had his mental condition closely monitored, going forward from August4, 2020, and that on or before December 18, 2020, Mr. Nelson needed immediate medical care and was not given such care. The failure to provide immediate medical care and mental health care, where Mr. Nelson 's health and mental condition was deteriorating, proximately caused his death.

141.     Mr. Nelson desperately required prompt medical attention from all defendants on December 18, 2020. Defendants had actual and constructive knowledge of Mr. Nelson 's need for immediate medical care as he mentally decompensated, in a suicidal state, and needed immediate medical care and was not given such care.

142.     Defendants failed to discharge the duty imposed upon them by G.C. § 845.6. As a direct and proximate result of Defendants' acts and/or omissions,

here above described, Mr. Nelson  suffered serious physical injuries, resulting in his untimely death.

143.    Defendant COUNTY is liable for its employees' breach of duty to summon immediate medical care while acting in the course and scope of their employment under the doctrine of Respondeat Superior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against all Defendants, and DOES 1 through 10 inclusive, as follows:

1.    For compensatory damages including special and general in an amount to be proven at trial;

2.    *SB 447* pre-death survival damages;

3.    For punitive damages against the individual defendants in an amount to be proven at trial;

4.    For interest;

5.    For reasonable costs of this suit and attorneys' fees per 42 U.S.C. 6 §1988 and C.C. 52.1 et seq.; and

6.    For such further other relief as the Court may deem just, proper, and appropriate.


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.


Date: January 10, 2022           THE SEHAT LAW FIRM, PLC


                                 By: */s/ Cameron Sehat*
                                 Attorneys for Plaintiff